UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PLACER ARC d/b/a PLACER ADVOCACY RESOURCES & CHOICES,<br><br>Defendant. | No. 2:13-cv-0577-KJM-EFB<br><br>ORDER |

   The United States Equal Employment Opportunity Commission (EEOC) brings this case against Placer ARC, doing business as Placer Advocacy Resources & Choices (ARC). The EEOC's complaint was filed on behalf of Homeyra Kazerounian, the charging party. It alleges ARC discriminated against Ms. Kazerounian because of her disability, deafness, in violation of the Americans with Disabilities Act (ADA).

   A trial is set to begin in this case on November 30, 2015. The matter is before the court on the parties' motions *in limine*. This order addresses two of ARC's motions: the second, which seeks to exclude testimony by an EEOC expert witness, Dr. Shana Williams, Psy.D; and the seventh, which seeks to exclude testimony by Lindy Hicks, a former ARC employee. For the

1

reasons described below, these two motions are DENIED.  The remaining motions will be addressed in court on the first day of trial.

I.   GENERAL BACKGROUND[1]

Ms. Kazerounian has been deaf since the early stages of her childhood.  She was born and raised in Iran.  When she lived in Iran, she communicated using Iranian Sign Language and in Farsi.  She moved to Roseville, California with her husband in 2000.  Mr. Kazerounian is also deaf.  Ms. Kazerounian's primary language in the United States is American Sign Language.  She knows some English, but it can be hard for her to read and write in English.

ARC is a non-profit organization that provides services to individuals with intellectual and developmental disabilities in Auburn and Roseville, California, among other locations.  It provides programs to its disabled clients to help support their development in important life areas, for example, personal care, health, finances, visual and performing arts, volunteerism, vocational guidance, and higher education.

In 2004, ARC accepted Ms. Kazerounian as a volunteer in its Auburn program.  She worked under the supervision of Program Director Lindy Hicks.  In April 2005, ARC hired Ms. Kazerounian as an Instructional Aide at its Auburn facility, still under Ms. Hicks's supervision.  ARC provided certified sign language interpreters for Ms. Kazerounian on a near-weekly basis from April 2005 through early 2008.  Ms. Hicks took a leave of absence in June 2007, and her employment was terminated from ARC in September 2007.  In February 2008, Ms. Kazerounian became a 1:1 Instructional Aide in ARC's Roseville Adult Center facility under the supervision of Program Director Patty Felland.  The next month, ARC hired Sheila Maas as an Instructional Aide and with the understanding that Ms. Maas would provide interpretation services to Ms. Kazerounian.  Within a few weeks, Ms. Kazerounian told ARC that she found Ms. Maas's interpretation services unsatisfactory.

---

[1] The following facts are summarized from the court's amended final pretrial order, ECF No. 118, which lists facts the parties have agreed are undisputed; from the declaration of Homeyra Kazerounian, ECF No. 75; and from the declaration of Elizabeth Marchant, ECF No. 105.

2

In December 2008, Ms. Kazerounian filed a complaint of discrimination with the California Department of Fair Employment and Housing, which was dually filed with the EEOC, alleging disability discrimination.  Ms. Kazerounian left ARC in May 2010, and in October 2010, she filed a charge of discrimination with the EEOC, alleging she was constructively discharged. This action followed.

The EEOC filed a complaint in this court in March 2013.  It alleges ARC did not reasonably accommodate Ms. Kazerounian's disability because it did not provide qualified sign language interpreters or other reasonable and effective accommodations after February 2008.  The EEOC also alleges ARC retaliated against Ms. Kazerounian for asserting her rights under the ADA, and alleges her work conditions became so intolerable that she was forced to resign.  ARC contends it provided reasonable accommodation to Ms. Kazerounian and did not violate the ADA.  ARC further argues that providing Ms. Kazerounian sign language interpreters as she requested would have caused it undue hardship.

ARC moved for summary judgment in December 2014.  The court granted the motion in part, finding the undisputed facts did not allow the EEOC to proceed on a claim of retaliation in violation of the ADA.  ECF No. 97.  The motion was denied with respect to the EEOC's other claims.  *Id.*  ARC's motions in limine were filed August 20, 2015.  ARC Mot. in Limine (MIL) No. 2, ECF No. 100; ARC MIL No. 7, ECF No. 105.  The EEOC filed opposition briefing, ECF No. 138, and ARC replied, ECF Nos. 145, 150.

II.     ARC'S MOTION IN LIMINE NO. 2: TESTIMONY BY DR. WILLIAMS

   A.     Background

       1.     Dr. Williams's Qualifications

The EEOC designated Dr. Shana Williams, Psy.D as a retained expert to offer opinions about "Ms. Kazerounian's functional ability to communicate in American Sign Language (ASL) and in English."  R. Rediger Decl., Ex. B (Williams Rep.), at 1, ECF No. 100. Dr. Williams is a licensed psychologist.  *Id.*  She earned a Master of Science in Psychology from the Miami Institute of Psychology in 1995 and a Doctorate of Clinical Psychology from Carlos Albizu University in 1998.  Williams Rep. App. C.  In 1999, she completed a postdoctoral

3

residency in outpatient mental health for the deaf and hard of hearing.  *Id.*  She is the Director of Psychological Services at Children's Center for Development and Behavior in Fort Lauderdale, Florida.  Williams Rep. at 1.  She is a licensed and practicing clinical psychologist, a former adjunct professor in that field, and has served as a court-appointed expert and advocate for deaf and non-verbal clients.  *Id.*

### 2. Assessment of Ms. Kazerounian's Abilities

On September 24 and 25, 2014, Dr. Williams administered several tests to assess Ms. Kazerounian's language and communication abilities.  *Id.*  She performed a Sign Language Proficiency Interview (SLPI) to "measure[ ] her ability to use receptive and expressive Sign Language to communicate."  *Id.* at 9.  She administered the Denver Scale Quick Test to assess Ms. Kazerounian's ability to read speech, or in colloquial terms, to read lips.  *Id.* at 10.  She used the Comprehensive Test of Nonverbal Intelligence (CTONI-2) to test Ms. Kazerounian's "general intelligence."  *Id.* at 11.  She performed the second edition of the Wechsler Individual Achievement Test to assess Ms. Kazerounian's reading, writing, mathematics, and oral language abilities.  *Id.* at 14.  And she used the Validity Indicator Profile test to ensure the validity of the other assessments.  *Id.* at 16.

In the section of Dr. Williams's report subtitled "Summary of Findings," she expresses several opinions.  Ms. Kazerounian's ASL was "clear and fluent" and she communicated solely in Sign Language.  *Id.* at 17.  She received an "Advanced" rating in the SLPI.  *Id.* at 18.  Ms. Kazerounian relies on "multimode means of receptive communication"; that is, "[s]he relies on visual cues, Sign Language, body and facial expression, previous knowledge, and synthesis to understand receptive communication."  *Id.*  The results of the CTONI-2 cognitive test were "solidly in the average range."  *Id.* at 17.  But Ms. Kazerounian's English reading and comprehension scores were "in the Extremely Low range."  *Id.* at 18.  Similarly, Ms. Kazerounian "was often not able to synthesize English words spoken on the lips."  *Id.*  She "could not understand verbal presentation even when she was able to see the speaker's lips."  *Id.*  Stress, environmental noise, fatigue, and unfamiliarity with the speaker reduce her speech reading adequacy, as is typical for those who are deaf or hard of hearing.  *Id.*  Nevertheless, the results of

4

1  the cognitive tests indicate "she would have the ability to perform the job tasks she described and
2  that were listed on her job descriptions." *Id.*  And the validity test indicated Ms. Kazerounian
3  attempted to respond correctly, gave adequate effort, and was a "Compliant responder." *Id.*

4         As part of her assessment, Dr. Williams also reviewed Ms. Kazerounian's
5  deposition, "her job descriptions, notes from morning meetings and communication books." *Id.*
6  She concluded Ms. Kazerounian is able to communicate effectively in ASL, but "detailed or
7  lengthy written information, such as training on care of a colonoscopy bag or understanding an
8  in-service training or staff meeting, would not provide her with effective communication." *Id.*
9  "She would benefit from qualified interpreters for detailed information exchanges." *Id.* at 19.
10 But she could rely on written English notes for "brief and basic interactions such as discussions of
11 the toileting schedule with a staff member" or "a list of known tasks for the day." *Id.*

12        Dr. Williams formed an opinion that Ms. Kazerounian was not able to
13 communicate effectively with Ms. Maas because Ms. Maas relied primarily on finger spelling.
14 *Id.*; Williams Dep. at 81.  Finger spelling is not equivalent to Sign Language and was inadequate
15 to provide Ms. Kazerounian the information she needed for her job.  Williams Rep. at 19.  Dr.
16 Williams also concluded "Ms. Kazerounian was unable to effectively receive communication"
17 from an ARC client in a wheelchair if she was behind the client.  *Id.* at 19–20.  "The very nature
18 of her communication system requires access to the visual field in order to gain information from
19 environmental cues, facial and body expressions, and other nonverbal markers." *Id.* at 19.  While
20 Ms. Kazerounian was walking behind the client in the wheelchair, her ability to perceive the
21 client's requests or expressions of distress was limited.  *Id.* at 19–20.

22        3.    <u>Variation of Test Results Over Time</u>

23        As noted above, Dr. Williams formed these opinions on the basis of evaluations
24 performed in 2014, but Ms. Kazerounian worked at ARC between 2005 and 2010.  In deposition,
25 counsel asked Dr. Williams whether she would "expect any variation in the outcome of any of the
26 tests that [she] administered to Ms. Kazerounian in 2014 if [she] had administered those same
27 tests in 2010."  Williams Dep. 136.  Dr. Williams testified that she did not know how Ms.
28 Kazerounian would have responded to "any of the tests" she performed had those tests been

conducted in 2010 rather than 2014. *Id.* at 136–37. Dr. Williams "had never met her prior to this assessment" in 2014. *Id.* at 136. Counsel also asked Dr. Williams more specific questions about the individual tests she performed, and she responded similarly that she did not know whether those tests would have yielded different results if conducted earlier. *See id.* at 102, 132–33, 160. The EEOC objected to several of these questions because they called for facts outside the record and beyond the area of Dr. Williams's testimony. *See, e.g.*, *id.* at 137.

When asked whether anything in particular would lead the results of her testing to differ over time, Dr. Williams identified head trauma, sinus conditions, the person's general state, physical health, environment, and the mere passage of time. *Id.* at 137–38. But she clarified that her testing "should account for time progression"; "[t]here should be very little variation." *Id.* In opposition to ARC's motion in limine, Dr. Williams submitted a declaration "to clarify [her] deposition testimony and to clear up apparent confusion" about what she said. Williams Decl. ¶ 1, ECF No. 140. She acknowledged she does not know how Ms. Kazerounian would have scored on the various tests had they been conducted between 2005 and 2010, but she is "able to form an opinion about Ms. Kazerounian's cognitive functioning and language abilities during that time frame." *Id.* ¶ 11. Although she cannot say the scores would be identical, "test scores are normed such that there should be little variation in the statistical outcome across a progression of time." *Id.* ¶ 15. Dr. Williams did not make this clarification after her initial review of the deposition transcript. *See* R. Rediger Decl. Ex. D, ECF No. 100.

          4.      <u>Testimony Regarding Deaf Culture</u>

Dr. Williams's report also includes information about her experience in the Deaf community and her opinions about Deaf culture in general. *See* Williams Rep. 7–9. She describes values Deaf people often share, including collectivism, their use of vision, and common norms and etiquette. *Id.* at 7–8. For example, "Deaf people are known for long goodbyes, and delaying the end of conversations." *Id.* at 7. And, "Deaf culture is physical; they often touch during conversations . . . ." *Id.* She notes some common misconceptions about the Deaf community, including that "facial expressions are often misinterpreted by hearing people as conveying emotions that are not accurate," and that a Deaf person's nodding or other gestures do

6

not indicate agreement, but may be nonverbal equivalents of the filler language common to spoken English, like "mmm hmmm," "uh huh," or "I see." *Id.* at 7–8.

### B. Legal Standard

An expert witness's opinions may be admissible if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Whether expert testimony is admissible is a question within the trial court's discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). The court plays a "gatekeeping" role to ensure all expert testimony, scientific or otherwise, is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir.), *cert. denied*, 135 S. Ct. 870 (2014) (citation and quotation marks omitted). The district court must screen out "unreliable nonsense opinions," but the jury may hear and weigh expert opinions that are impeachable. *Id.* at 1044. In other words, the district court does not determine whether the expert is right or wrong, but whether the testimony would be helpful. *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

### C. Discussion

ARC does not challenge Dr. Williams's credentials or qualifications as a psychologist; rather, it argues Dr. Williams's testimony is inadmissible for three different reasons. First, it argues Dr. Williams's 2014 testing cannot establish what Ms. Kazerounian's communicative and cognitive skills were during the time she worked at ARC, between 2005 and 2010. Second, it argues Dr. Williams's opinions about the reasonableness of ARC's

7

accommodations in those years are speculative because Dr. Williams lacked facts and data about Ms. Kazerounian's cognitive and language abilities between 2008 and 2010. And third, it argues Dr. Williams's opinions about Deaf culture are inadmissible because they account for neither Ms. Kazerounian's immigration from Iran in 2000 nor the differences between Iranian Deaf culture and Deaf culture in the United States. And finally, in the alternative, ARC requests an order confining Dr. Williams's testimony to a list of twelve specific opinions identified during her deposition.

### 1. Time Difference

Dr. Williams's opinions are reliable despite her reliance on test results that postdate Ms. Kazerounian's employment. No evidence suggests Ms. Kazerounian's communicative and cognitive abilities were transformed between 2005 and 2014. No evidence suggests Ms. Kazerounian experienced head trauma, sinus conditions, or changes in her physical health or environment. Neither has ARC presented the testimony of another expert to show Dr. Williams's testing was unreliable. In addition, Dr. Williams testified in her deposition that her testing "should account for time progression." Williams Dep. at 138. She testified "[t]here should be very little variation." *Id.* To the extent ARC has a basis for believing in good faith Ms. Kazerounian's abilities have changed, ARC may raise these differences during its cross examination and suggest in closing argument the jury should not lend weight to her opinions.

Although clothed in the language of methods and principles, at its core ARC's motion challenges the factual basis of Dr. Williams's opinions. ARC correctly points out that her testing used no factual inputs from the period of Ms. Kazerounian's employment. But "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) (quoting *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004)).

While the court denies ARC's motion without consideration of Dr. Williams's post-deposition declaration, ECF No. 140, the court notes that the burden will be on the EEOC to demonstrate why it should be allowed to elicit testimony consistent with the declaration, if it seeks to do so. *See* Fed. R. Civ. P. 26(a)(2), 37(c)(1).

### 2. Effectiveness of Accommodations

ARC also argues Dr. Williams's opinions about ARC's accommodations are speculative because she lacked data predating September 2014. This aspect of ARC's motion is denied for reasons equivalent to those described above. The court also finds Dr. Williams's opinions have a reliable factual basis in this respect. She read Ms. Kazerounian's deposition, spoke to Ms. Kazerounian, reviewed her job description, and considered other documents from Ms. Kazerounian's time at ARC. Dr. Williams considered the results of the tests she conducted and found that with certain specific accommodations, Ms. Kazerounian would likely have been able to perform the tasks listed in her job description.

### 3. Deaf Culture

"[E]xpert testimony on issues of culture properly is admitted when relevant and not unfairly prejudicial." *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 481 (9th Cir. 1991) (collecting authority); *see also Bowoto v. Chevron Corp.*, No. 99-02506, 2006 WL 2604592, at *3 (N.D. Cal. Aug. 23, 2006) (collecting authority to show expert testimony may be admissible as "background material, when cultures or locations would be foreign to a jury"). Here, most laypersons have little or no first-hand experience with the Deaf community. Dr. Williams has years of experience, research, and formal education at her disposal. Her testimony about Deaf culture will likely be helpful to the jury.

ARC does not challenge this general proposition, but argues Dr. Williams's knowledge of Deaf culture is irrelevant because Ms. Kazerounian emigrated from Iran only four years before she began working at ARC. It argues Dr. Williams did not take into account the differences between Deaf culture in Iran and in the United States. Although this argument is plausible as a general matter, ARC offers no evidence to illustrate the difference between Deaf culture in the United States and Iran. It argues only that a difference must exist and cites a law review article noting that a common American gesture of approval, a thumbs-up, is vulgar in Iran. *See* Reply MIL No. 2, at 7 n.3, ECF No. 145 (citing Ira P. Robbins, *Digitus Impudicus: The Middle Finger and the Law*, 41 U.C. Davis L. Rev. 1403, 1419 (2008)). This argument is not sufficient to show Dr. Williams's testimony is unreliable or irrelevant. Neither does it account for

9

1  the fact that Dr. Williams's report acknowledges Ms. Kazerounian's heritage and family
2  background. Williams Rep. 2–5. Any prejudice that might arise from the presentation of this
3  opinion may be mitigated by cross examination and closing argument. *See, e.g.*, *United States v.*
4  *Hymas*, 605 F. App'x 622, 623 (9th Cir. 2015) ("[A]ny unfair prejudice caused by jury confusion
5  could be mitigated through cross examination and closing argument.").
6          The motion to exclude Dr. Williams's testimony is denied.
7          4.        Limitation on Expert Testimony
8          Finally, as noted above, ARC argues Dr. Williams's trial testimony must be
9  confined to a list of twelve opinions developed in her deposition. The court declines to limit Dr.
10  Williams's testimony to that list. She confirmed in deposition that her report, in its entirety,
11  identifies her opinions, which are summarized on page 20 of the report. *See, e.g.*, Williams
12  Dep. 45 ("Q. . . . What are the opinions that you are prepared to testify to in this case? A. Those
13  opinions are summarized in my report . . . ."); *id.* 140 ("[M]y report in entirety is my finding.").
14  Her report adequately explains and gathers her opinions, and ARC will suffer little or no
15  prejudice if she is allowed to present the opinions in her report at trial.
16  III.        ARC'S MOTION IN LIMINE NO. 7: TESTIMONY BY LINDY HICKS
17          A.        Background
18          As summarized above, Ms. Kazerounian worked as an Instructional Aide in
19  ARC's Auburn and Meadow Vista facilities between April 2005 and February 2008. Until June
20  2007, she worked under the supervision of Lindy Hicks, who was Program Director. ARC
21  provided certified sign language interpreters about once a week from April 2005 through early
22  2008. The EEOC does not allege any deficiencies in the interpretation services ARC provided
23  before February 2008. *See* Compl. ¶¶ 11, 25–26. It alleges these interpretation services were in
24  fact a reasonable accommodation for Ms. Kazerounian's disability. *Id.* ¶ 11.
25          In early 2008, Ms. Kazerounian moved to ARC's Roseville Adult Center and
26  worked under the supervision of a different Program Director. Her claims of discrimination arise
27  at the earliest in February 2008, when she alleges ARC provided inadequate interpretation
28  services and no other reasonable accommodation. *See id.* ¶ 12.

1           The EEOC intends to call Ms. Hicks to give testimony about "her role in hiring
2    Ms. Kazerounian to work at Placer ARC, including inquiries into reasonable accommodations she
3    would need to perform her job"; what "reasonable accommodations she approved for Ms.
4    Kazerounian"; "her personal interactions with and perceptions of managers and staff who are
5    witnesses in this case; her personal observations and impressions about Ms. Kazerounian's ability
6    to communicate with staff and Defendant's consumers; her personal observations and impressions
7    about the quality of Ms. Kazerounian's work"; "the lack of a disciplinary history during their
8    shared period of employment"; and other related topics.  Am. Final Pretrial Order 24, ECF
9    No. 118.
10          ARC moves to exclude Ms. Hicks's testimony for three reasons.  First, it argues
11   she cannot offer any relevant personal observations about Ms. Kazerounian's ability to perform
12   the essential functions of her position after February 2008.  Second, it argues the probative value
13   of Ms. Hicks's testimony is substantially outweighed "by confusion of the issues, misleading the
14   jury, undue delay, and waste of time."  ARC MIL No. 7, at 4, ECF No. 105.  ARC also warns that
15   if Ms. Hicks testifies, ARC will require "a significant amount of time" to address Ms. Hicks's
16   own job performance.  *Id.*  Third, ARC objects that the EEOC contacted Ms. Hicks ex parte in an
17   effort to attack ARC unfairly.  It points out that Ms. Hicks's previous declaration, submitted in
18   support of the EEOC's opposition to ARC's motion for summary judgment, may be construed to
19   offer assessments of Ms. Kazerounian's abilities on ARC's behalf.  *See* Hicks Decl. ¶ 8, ECF No.
20   74-3 ("[Ms. Kazerounian's] responses satisfied me and Placer ARC that she was qualified for the
21   Instructional Aide position and Placer ARC hired her.").  ARC argues that if Ms. Hicks is allowed
22   to testify, her acts and opinions may be imputed to ARC for purposes of its liability.
23          B.      Relevance
24          Testimony is relevant if "(a) it has any tendency to make a fact more or less
25   probable than it would be without the evidence; and (b) the fact is of consequence in determining
26   the action."  Fed. R. Evid. 401.  Relevance is not a strict test.  *United States v. Miranda-Uriarte*,
27   649 F.2d 1345, 1353 (9th Cir. 1981).  As the words "any tendency" suggest, it is typically quite a
28

"low bar to the admissibility of evidence." *Capitol Specialty Ins. Corp. v. Beach Eatery & Surf Bar, LLC*, 36 F. Supp. 3d 1026, 1037 (E.D. Wash. 2014) (citation and quotation marks omitted).

Here, to succeed on its claim for disability discrimination, the EEOC must prove Ms. Kazerounian was disabled, qualified, and discriminated against because of her disability. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007). "A 'qualified individual' is 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Id.* (quoting 42 U.S.C. § 12111(8)) (emphasis omitted). "'Essential functions' are 'fundamental job duties of the employment position . . . .'" *Id.* (quoting 29 C.F.R. § 1630.2(n)(1)). "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply. If, on the other hand, a person can perform a job's essential functions, and therefore is a qualified individual, then the ADA prohibits discrimination . . . ." *Cripe v. City of San Jose*, 261 F.3d 877, 884–85 (9th Cir. 2001).

Despite the fact that the claimed discrimination occurred only after Ms. Hicks left ARC, she may offer testimony about Ms. Kazerounian's ability to perform the essential functions of an Instructional Aide. If Ms. Hicks testifies consistently with her previous declaration that Ms. Kazerounian could perform the essential functions of her job in 2007, it is more likely the EEOC will establish Ms. Kazerounian could also perform those same essential functions in 2008. Ms. Hicks's testimony is relevant in this respect at least.

While the court denies the motion on this ground, it also appears the other areas the EEOC anticipates covering with Ms. Hicks are fair game, with the possible exception of certain aspects of her personal interactions with and perceptions of managers and staff who are witnesses in this case.

C.  Prejudice

Evidence may be inadmissible despite its relevance: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence should be

excluded under Rule 403 with caution and only sparingly; "the Rule's 'major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.'" *United States v. Haischer*, 780 F.3d 1277, 1282 (9th Cir. 2015) (quoting *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000)). And "evidence is to be excluded only 'if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice." *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1056 (9th Cir. 2015) (quoting Fed. R. Evid. 403) (alteration and emphasis in *Microsoft Corp.*).

Here, any danger of any unfair prejudice, confusion, or wastefulness associated with Ms. Hicks's testimony does not substantially outweigh its probative value. ARC has not shown Ms. Hicks's testimony would be duplicative and could be introduced through alternative means. Rather, it argues (1) the jury may decide Ms. Kazerounian was qualified in 2008 and later on the basis of Ms. Hicks's experience with her before any discrimination allegedly occurred; and (2) if Ms. Hicks testifies, ARC will be obligated to introduce evidence about Ms. Hicks's own employment. First, ARC may minimize or eliminate any confusion by reminding the jury in cross examination and closing argument that Ms. Hicks's employment never overlapped with the alleged discrimination. Second, the relevance of Ms. Hicks's own employment history is unclear, but assuming it is relevant, ARC has not shown the introduction of this evidence will require significant amounts of time.

D. *Ex Parte* Contact with Opposing Parties

The Eastern District has adopted the Rules of Professional Conduct of the State Bar of California and any applicable state court decisions as its own standards of professional conduct. E.D. Cal. L.R. 180(e). The District's local rules require both familiarity and compliance with California's Rules. *Id.* In the absence of an applicable California rule, the American Bar Association's Model Rules may also be considered guidance. *Id.*

1. California Rule 2-100(a)

California Rule 2-100(a) provides, "While representing a client, a member [of the bar] shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member

has the consent of the other lawyer." Cal. R. Prof. Conduct 2-100(A). "For purposes of this rule, a 'party' includes: . . . An officer, director, or managing agent of a corporation or association, and a partner or managing agent of a partnership . . . ." *Id.* R. 2-100(B)(1). The discussion appended to this rule clarifies that it is "intended to apply only to persons employed at the time of the communication." Cal. R. Prof. Conduct 2-100, Discussion (citing *Triple A Machine Shop, Inc. v. State of Cal.*, 213 Cal. App. 3d 131 (1989)).

In *Triple A Machine Shop*, the California Court of Appeal held that Rule 2-100 "permits opposing counsel to initiate ex parte contacts with unrepresented former employees, and present employees (other than officers, directors or managing agents) who are not separately represented . . . ." 213 Cal. App. 3d at 140. But if the communication involves "the employee's act or failure to act in connection with the matter which may bind the corporation," or if the employee's act or failure to act may "be imputed to [the corporation], or constitute an admission of the corporation for purposes of establishing liability," then Rule 2-100 does not allow the ex parte communication. *Id.* To reach this decision, the *Triple A* court relied in part on *Upjohn Co. v. United States*, in which the United States Supreme Court held that "mid-level and lower-level employees 'can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties.'" *Id.* at 139 (quoting 449 U.S. 383, 391 (1981)).

2.     ABA Model Rule 4.2

Rule 4.2 of the ABA Model Rules is similar to California Rule 2-100: "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." ABA Model Rule 4.2. This rule's first comment explains it is meant to protect "a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers." ABA Model Rule 4.2, cmt. 1. That is, the rule prohibits "interference by those lawyers with the client-lawyer relationship and the uncounseled disclosure of information relating to the

14

1  representation." *Id.*  Comment 7 discusses the application of Model Rule 4.2 to organizational
2  clients:

> [T]his Rule prohibits communications with a constituent of [a represented] organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

*Id.* cmt. 7.  But "[c]onsent of the organization's lawyer is not required for communication with a former constituent."  *Id.*

"The majority of court decisions dealing with efforts to interview a corporate party's former employees ex parte have held that Rule 4.2 does not prohibit such contacts." *Serrano v. Cintas Corp.*, No. 04-40132, 2009 WL 5171802, at *2 (E.D. Mich. Dec. 23, 2009) (citing *Valassis v. Samelson*, 143 F.R.D. 118 (E.D. Mich. 1992)); *see also, e.g.*, *Rubis v. Hartford Fire Ins. Co.*, No. 11-796, 2012 WL 1288483, at *3 (D. Conn. Apr. 16, 2012) (same); *Bryant v. Yorktowne Cabinetry, Inc.*, 538 F. Supp. 2d 948, 950 n.2 (W.D. Va. 2008) (collecting cases); *Packard Bell NEC, Inc. v. Aztech Sys. LTD.*, No. 98-7395, 2001 WL 880957, at *7 (C.D. Cal. Jan. 22, 2001) (reaching same conclusion when interpreting California Rule of Professional Conduct 2-100); *Nalian Truck Lines, Inc. v. Nakano Warehouse & Transp. Corp.*, 6 Cal. App. 4th 1256, 1262 (1992) (same).  The same is true when an attorney interviews former members of management.  For example, another district court in this circuit concluded Model Rule 4.2's text and comments made no effort "to distinguish between former managerial employees and former 'lower echelon' employees."  *United States v. W. R. Grace*, 401 F. Supp. 2d 1065, 1069 (D. Mont. 2005).  Therefore, the government plaintiff did not violate ethical standards by initiating ex parte contact with a corporate defendant's former employees, regardless of their previous positions.  *Id.*; *see also, e.g.*, *Nalian Truck Lines*, 6 Cal. App. 4th at 1262 ("If the drafters of [California] rule 2-100 had intended to prohibit ex parte communications with all former and current control group employees, they would have expressed this intention in the comment.").  This court cited *W.R. Grace* for this proposition in its previous order on ARC's motion for

15

summary judgment. *See E.E.O.C. v. Placer ARC*, ___ F. Supp. 3d ___, 2015 WL 4250662, at *2 (E.D. Cal. July 13, 2015).

In some instances, however, courts have adopted safeguards or guidelines when the unrepresented former employee may make statements that would bind or impute liability to her former employer. *See, e.g.*, *Rubis*, 2012 WL 1288483, at *4; *Serrano*, 2009 WL 5171802, at *4. In *Serrano*, the EEOC requested an order permitting its attorneys to contact the defendant's former employees, including expressly those employees who made hiring decisions. 2009 WL 5171802, at *1. The *Serrano* court listed "various circumstances" in which "former corporate employees fall within the ambit of Rule 4.2," such that some protection is required. *Id.* at *2. These circumstances included "the former employees' membership during their employment in the corporation's management or control group"; "involvement in litigation or other events leading to their exposure to privileged or confidential information during their employment status"; and "employees whose conduct during their employment by a corporate party may be imputed to the employer." *Id.* at *2–3. In particular, the court considered that "the acts or omissions of former corporate employees prior to the termination of their agency relationship may be imputed to a corporate employer." *Id.* at *3. *Serrano* has been criticized, however, as a minority view that should be confined to its facts. *See, e.g.*, *Thurston v. Okemo Liab. Co.*, __ F. Supp. 3d __, 2015 WL 4979631, at *3 (D. Vt. Aug. 18, 2015).

### 3. Discussion

Here, no attorney from ARC was present when counsel for the EEOC contacted Ms. Hicks, and it appears ARC was unaware the EEOC spoke to Ms. Hicks until her declaration was filed. Ms. Hicks also worked as a "Program Director," and she attended meetings of ARC's Board of Directors. Hicks Decl. ¶ 21, ECF No. 74-3. Nevertheless, Ms. Hicks was not a current ARC employee when the EEOC contacted her. As discussed above, California Rule 2-100 and ABA Model Rule 4.2 do not lend dispositive effect to a former employee's erstwhile managerial status. *See, e.g.*, *W. R. Grace*, 401 F. Supp. 2d at 1069; *Nalian Truck Lines*, 6 Cal. App. 4th at 1262; *Triple A Machine Shop*, 213 Cal. App. 3d at 140.

Although managerial status may not be dispositive, as noted above, courts have expressed reservations about ex parte contacts with former employees whose statements may be imputed to the corporation for purposes of its liability. *See Triple A*, 213 Cal. App. 3d at 140 (Cal. R. Prof. Conduct 2-100(A)); *Serrano*, 2009 WL 5171802, at *2–3 (ABA Model Rule 4.2). Here, however, Ms. Hicks was not the person who made the decisions the EEOC challenges in its complaint; she was no longer with ARC in the time period in question. Neither does the EEOC's description of Ms. Hicks's testimony suggest it intends to equate Ms. Hicks's actions or opinions with ARC's. Rather, the EEOC intends to call Ms. Hicks to give testimony about Ms. Kazerounian's ability to perform the essential functions of her job, whether reasonable accommodations allowed Ms. Kazerounian to perform those duties, and her impression and evaluation of Ms. Kazerounian's work. Because Ms. Hicks was not a current employee at the time the EEOC contacted her and because the court perceives little danger her actions or testimony will be imputed to ARC for purposes of ARC's liability, the motion to exclude her testimony is denied.

## IV. CONCLUSION

ARC's second and seventh motions in limine are DENIED. This order resolves ECF Nos. 100 and 105. The parties are reminded that "[w]here a district court makes a tentative *in limine* ruling excluding evidence, the exclusion of that evidence may only be challenged on appeal if the aggrieved party attempts to offer such evidence at trial, which allows the court to make a final ruling." *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir.), *cert. denied*, 136 S. Ct. 89 (2015) (citation and quotation marks omitted).

IT IS SO ORDERED.

DATED: November 24, 2015.

_____
UNITED STATES DISTRICT JUDGE